**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |
|---|---|
| **C B STRUCTURES, INC.,** | * |
| Plaintiff/Counter-Defendant, | * |
| v. | *     Case No.: PWG-14-2327 |
| **POTOMAC ELECTRIC POWER CO.,** | * |
| Defendant/Counter-Plaintiff. | * |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**MEMORANDUM OPINION**

The parties entered into a purchase order ("Contract") for Plaintiff C B Structures, Inc. ("C B Structures") to construct pole barns, which are "shed-like building[s] with no foundation and siding made of corrugated steel or aluminum," for Defendant Potomac Electric Power Co. ("Pepco") to use "to house its fleet of trucks" (the "Project"). Jt. Stmt. 1 & n.1, ECF No. 35. The Contract included a "Premium" of $68,220.00, Ex. 1, Jt. Rec. 1, ECF No. 36, and a Proposal Letter that C B Structures submitted to Pepco's engineering consultant stated that "'[f]or a premium of $68,220.00,'" C B Structures would "'substantially complete the buildings by 12-31-12,'" Jt. Stmt. 2 (quoting Proposal Ltr.). When Pepco refused to pay the Premium because C B Structures did not complete the Project by December 31, 2012, C B Structures filed suit for breach of contract, and Pepco counter-claimed for breach of contract and recoupment. Compl., ECF No. 2; Am. Counter-Cl., ECF No. 13. The parties have filed cross-motions for summary judgment on the narrow issue of the meaning of Premium as used in the Contract between the

parties. ECF Nos. 31, 32.[1] Although the use of "Premium" in the Contract itself is ambiguous, the undisputed extrinsic evidence clearly shows that Premium refers to an advance mobilization cost and not an incentive conditioned on the completion of the Project by the end of 2012. On that basis, I will grant C B Structures' motion and deny Pepco's motion.

## I.   THE CONTRACT

The Contract provides:

> This contract shall be governed by PHI [Pepco] Standard Terms and Conditions for Service Contracts V.8 with Safety Attachment A Rev. 5 ["Standard Terms"].
>
> . . .
>
> Install New Pole Barns
>
> This purchase order is for DoubleTree Structures ["DoubleTree," a division of C B Structures] to provide structural design, calculations, drawings, seals, submittals, material and construction according to [the] attached proposal for Forestville Service Center.

Jt. Rec. 1. It then includes an itemized list, with prices for each item, such as "Vehicle Canopy Structure #1 $124,295.00" and "Conduit, Trenching, Trench repair $13,800.00"; one line item is "Premium $68,220.00." *Id.*

The parties do not identify the "attached proposal," and it does not appear to be a part of the Joint Record Extract. The record does include the Standard Terms, which provide:

> <u>Contract.</u> The Contract shall consist of the Purchase Order, including any documents attached to or identified on the PO, any contract amendments or modifications, and any PHI-approved Contract Change Authorizations.

---

[1] Plaintiff's motion, styled as a Motion for Declaratory Judgment, shall be treated as a motion for summary judgment, which a party may seek on "[a] part of [a] claim," such as the narrow issue that the parties identify. *See Tauber v. Souza*, No. PWG-11-3639, 2013 WL 2045095, at *5 (D. Md. May 13, 2013) (noting that "a declaratory judgment . . . is a separate cause of action" and that "[a] motion for summary judgment is not a vehicle for a request for a declaratory judgment"). The parties fully briefed their cross-motions. ECF Nos. 33, 34. A hearing is not necessary. *See* Loc. R. 105.6.

> In the event of a conflict among terms contained in documents attached to, or identified in, the PO, such conflict shall be resolved in the following descending order of precedence:
> (i)     PHI prepared pre-bid and bid clarification minutes
> (ii)    PHI accepted portions of Contractor's Proposal
> (iii)   These Terms and Conditions
> (iv)    Attachments to these Terms and Conditions

Ex. 20, Jt. Rec. 59. None of these documents appearing in the record refers to the Premium or otherwise illuminates its meaning.

The record does include what the parties refer to as a "Proposal Letter," Ex. 2, Jt. Rec. 5. Yet, the parties refer to it as extrinsic evidence, Pl.'s Mem. 9; Def.'s Opp'n & Cross-Mot. 19–20, rather than an attachment to the Contract, suggesting that it is not the "attached proposal" or another document that constituted part of the Contract, as Contract is defined in the Standard Terms. *See SG Homes Assocs., LP v. Marinucci*, 718 F.3d 327, 335 (4th Cir. 2013) (stating that a document referenced in a writing "'is to be interpreted as part of the writing'") (quoting *Ray v. William G. Eurice & Bros., Inc.,* 93 A.2d 272, 279 (Md. 1952)). Written by DoubleTree's general manager to Pepco's engineering consultant, Birdsall Services Group ("Birdsall"), (who in turn forwarded it to Pepco) with regard to the Project for Pepco, the Proposal Letter states:

> Per our original proposal and preliminary schedule, C.B. Structures intends to be substantially complete with the Forestville buildings in February and 100% complete by March 31, 2013, at the original price quoted. That is a comfortable schedule that allows for typical weather delays and normal working hours.
>
> We have more than enough resources available to be able to complete the project by December 31, 2012. However, in an effort to provide the most competitive price possible we did not factor the necessary *premium expenses* for early completion into our original price.
>
> For a *premium of $68,220.00*, we will substantially complete the buildings by 12-31-12.
>
> This *premium* will allow us to: authorize all the necessary overtime; bring on temporary staff as needed; cover *overtime premiums* charged by subs and suppliers; cover costs for temporary heat and/or special materials/mixes.

3

>   This completion time is barring any major weather delays or any approval delays from owner/government agencies and excludes any placing of asphalt.
>
>   . . .

Jt. Rec. 5 (emphasis added).

## II.     THE PARTIES' POSITONS

The parties have completed stage 1 discovery as identified in the Discovery Order that I issued, ECF No. 11-1, and, although they dispute various material facts regarding which they will seek additional discovery, at this juncture they ask the Court to resolve a single matter of law: the meaning of Premium as used in the Contract. Jt. Stmt. 10. As C B Structures sees it, the Contract language is unambiguous and "does not condition Pepco's payment of the 'Premium' of $68,220 on completion of C B Structures' work prior to the end of 2012." Pl.'s Mem. 6. Rather, in C B Structures' view, "the total contract amount to be paid CB Structures as stated in the Purchase Order includes the amount of the $68,220 premium." *Id.* at 7. In other words, it is C B Structures' position that the $68,220 Premium was an increase in the price that C B Structures originally quoted to Pepco before Pepco asked that it accelerate the completion date by three months, which would cause C B Structures to incur additional mobilization expenses that it would not incur if it had longer to complete the construction. In a nutshell, the Premium was an addition to the purchase price, not a bonus conditioned upon completion by a date certain. Additionally, C B Structures contends that "[e]ven if the language of the Contract is determined to be ambiguous, the undisputed extrinsic evidence in this case when interpreted according to the rules of contract interpretation," and construed against Pepco as the drafter, "proves that C B Structures was not required to complete its work by December 31, 2012 as a condition precedent to payment of the Premium." *Id.* at 7–8. Not so, says Pepco. In its view, the term Premium as used in the Contract is ambiguous, and "parol evidence clearly demonstrates that the Premium

was conditioned upon substantial completion of the project by December 31, 2012." Def.'s Opp'n & Cross-Mot. 10.

### III. SUMMARY JUDGMENT STANDARD

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, No. 12-1722, --- F.3d ---, 2013 WL 1866940, at *3 (4th Cir. May 6, 2013). When considering cross-motions for summary judgment, the court must consider "each motion . . . individually" and view "the facts relevant to each . . . in the light most favorable to the non-movant." *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003). Here, the parties agree that no genuine dispute exists as to the material facts related to the meaning of Premium and that "the issue could be resolved by the Court as a matter of law," *see* Jt. Stmt. 10; the issue is *which* party is entitled to judgment.

### IV. CONTRACT INTERPRETATION

Maryland law[2] regarding contract formation and interpretation is well-settled. "[T]he cardinal rule of contract interpretation is to give effect to the parties' intentions." *Dumbarton Imp. Ass'n, Inc. v. Druid Ridge Cemetery Co.*, 73 A.3d 224, 232 (Md. 2013) (quoting *Tomran, Inc. v. Passano*, 891 A.2d 336, 344 (Md. 2006)). Nonetheless,

---

[2] The parties agree that Maryland law applies. *See* Pl.'s Mem. 6; Def.'s Opp'n & Cross-Mot. 11.

> [c]ourts in Maryland apply the law of objective contract interpretation, which provides that "[t]he written language embodying the terms of an agreement will govern the rights and liabilities of the parties, irrespective of the intent of the parties at the time they entered into the contract, unless the written language is not susceptible of a clear and definite understanding."

*Id.* (quoting *Slice v. Carozza Properties, Inc.*, 215 Md. 357, 368, 137 A.2d 687, 693 (1958)). Thus, a contract "is 'measured by its terms unless a statute, regulation, or public policy is violated thereby.'" *Connors v. Gov't Employees Ins. Co.*, 88 A.3d 162, 166 (Md. Ct. Spec. App. 2014) (quoting *Pac. Indem. Co. v. Interstate Fire & Cas. Co.*, 488 A.2d 486, 488 (Md. 1985)).

When construing an unambiguous contract, "courts focus on the four corners of the agreement[,] and ascribe to the contract's language its customary, ordinary, and accepted meaning." *Dynacorp Ltd. v. Aramtel Ltd.*, 56 A.3d 631, 670 (Md. Ct. Spec. App. 2012) (citations and quotation marks omitted); *see 100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 60 A.3d 1, 23 (Md. 2013). "As such, '[a] contract's unambiguous language will not give way to what the parties thought the contract meant or intended it to mean at the time of execution.'" *Dumbarton*, 73 A.3d at 232 (quoting *Sy–Lene of Washington, Inc. v. Starwood Urban Retail II, LLC*, 829 A.2d 540, 546 (Md. 2003)). Additionally, the court must construe the contract "'in its entirety and, if reasonably possible, [give] effect . . . to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed.'" *Dumbarton*, 73 A.3d at 232–33 (quoting *Sagner v. Glenangus Farms, Inc.*, 198 A.2d 277, 283 (Md. 1964)). In these circumstances, the contract's construction is "an issue of law for resolution by the trial judge." *Bd. of Educ. of Charles Cnty. v. Plymouth Rubber Co.*, 569 A.2d 1288, 1296 (Md. Ct. Spec. App. 1990); *Pacific Indem. Co.*, 488 A.2d at 489.

6

The court also "may construe an ambiguous contract if there is no factual dispute in the evidence," *Pacific Indem. Co.*, 488 A.2d at 489, as is the case here. *See Chorley Enters. v. Dickey's Barbecue Restaurants, Inc.*, ---- F.3d ----, 2015 WL 4637967, at *6 (4th Cir. Aug. 5, 2015). Contract language is ambiguous "if, to a reasonably prudent person, the language used is susceptible of more than one meaning and not when one of the parties disagrees as to the meaning of the subject language." *Bd. of Educ. of Charles Cnty.*, 569 A.2d at 1296; *see Sierra Club v. Dominion Cove Point LNG, L.P.*, 86 A.3d 82, 89 (Md. Ct. Spec. App.2 014) ("[T]he mere fact that the parties disagree as to the meaning does not necessarily render [a contract] ambiguous."). "An ambiguity does not exist simply because a strained or conjectural construction can be given to a word." *Dumbarton*, 73 A.3d at 233 (quoting *Belleview Constr. Co. v. Ruby Hall Cmty. Ass'n*, 582 A.2d 493, 496 (Md. 1990)).

"When a writing is ambiguous, extrinsic evidence is admissible to determine the intentions of the parties to the document." *Point's Reach*, 2013 WL 4710568, at *17; *see Sy–Lene*, 829 A.2d at 544 (stating that parol evidence showing the meaning of contract language "is only admissible after the court finds the contract to be ambiguous"); *see also Dumbarton*, 73 A.3d at 234 ("'Extrinsic evidence is only utilized when the intent of the parties and the purpose of a restrictive covenant cannot be divined from the actual language of the covenant in question, necessitating a reasonable interpretation of the language in light of the circumstances surrounding its adoption.'") (citation omitted). "[E]xtrinsic evidence admitted must help interpret the ambiguous language and not be used to contradict other, unambiguous language." *Calomiris*, 727 A.2d at 366.

"'It is a basic principle of contract law that, in construing the language of a contract, ambiguities are resolved against the draftsman of the instrument.'" *John L. Mattingly Const. Co.*

*v. Hartford Underwriters Ins. Co.*, 999 A.2d 1066, 1078 (Md. 2010) (quoting *Burroughs Corp. v. Chesapeake Petroleum & Supply Co.*, 384 A.2d 734, 737 (Md. 1978)). The rationale for this rule is that the drafter "'had the better opportunity to understand and explain his meaning.'" *Anderson Adventures, LLC v. Sam & Murphy, Inc.*, 932 A.2d 1186, 1194 (Md. Ct. Spec. App. 2007) (quoting *L & H Enters., Inc. v. Allied Bldg. Prods. Corp.*, 596 A.2d 672, 676 (Md. Ct. Spec. App. 1991) (quoting *King v. Bankerd*, 492 A.2d 608, 612 (Md. 1985))).

## V.     DISCUSSION

The parties dispute the meaning of Premium. Although I must "ascribe to the contract's language its customary, ordinary, and accepted meaning," *Dynacorp Ltd.*, 56 A.3d at 670, "premium" has more than one meaning. The relevant definitions of "premium" include "[a] reward given for a specific act or as an incentive; a prize" and "[a] sum additional to interest, price, wages, or other fixed remuneration; any amount paid above the usual or nominal price; a sum added to an ordinary price or charge." *See* Premium, Oxford English Dictionary, http://www.oed.com.[3] Consequently, focusing only on the word "premium" itself, in isolation from the remainder of the Contract language, its "customary, ordinary, and accepted meaning" supports both parties' interpretations of the Contract language. *See Dynacorp Ltd.*, 56 A.3d at 670.

Indeed, the Contract itself—a simple purchase order that refers to a "Premium" of "$68,220.00"—does nothing to relieve this ambiguity when considered in its entirety. Even considering all documents referenced in the Standard Terms as part of the Contract, *see* Jt. Rec.

---

[3] The online edition of the Oxford English Dictionary appears at the top of Justice Scalia and Bryan Garner's list of "the most useful and authoritative for the English language generally." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 419, 423 (2012).

59, there is no explanation of the purpose of the Premium or the service or goods that the Premium covered.  A reasonably prudent person could conclude that the Premium was an additional charge for providing expedited service just as readily as someone reasonably could conclude that the Premium was an incentive for completing the Project by a date certain.  Either conclusion would be guesswork, as the Premium easily could have referred instead to an additional cost for higher grade building supplies.  Perhaps the "attached proposal" eliminated the ambiguity, but the parties have not identified or attached it.  Thus, the Contract as presented to the Court is ambiguous.  *See Bd. of Educ. of Charles Cnty.*, 569 A.2d at 1296.  Therefore, I will consider extrinsic evidence to determine the parties' intent.  *See Point's Reach*, 2013 WL 4710568, at *17.

      The Proposal Letter states that C B Structures would complete the Project "by March 31, 2013, at the original price quoted," which was "a comfortable schedule that allow[ed] for typical weather delays and normal working hours," but also that it *could* "complete the project by December 31, 2012" by incurring "necessary premium expenses" that it "did not factor . . . into [its] original price."  Jt. Rec. 5. It then states that, "[f]or a premium of $68,220.00, [C B Structures would] substantially complete the buildings by 12-31-12."  *Id.*  The Proposal Letter explains that the Premium would "allow [C B Structures] to: authorize all the necessary overtime; bring on temporary staff as needed; cover overtime premiums charged by subs and suppliers; cover costs for temporary heat and/or special materials/mixes."  *Id.*  It also cautions that the promised "completion time [was] barring any major weather delays or any approval delays," *id.*, suggesting that the Premium still applied if C B Structures did not complete the Project by December 31, 2012.

Importantly, the Proposal Letter uses the word "premium" four times. The first explains that when C B Structures bid the original job, it did so with the understanding that it would have until March 31, 2013 to achieve final completion. This timeframe allowed it to offer "the most competitive price possible," since it did not have to factor in the "necessary *premium expenses* for early completion." Jt. Rec. 5 (emphasis added). Clearly, the word "premium" was qualified by the word "expenses" and explained why C B Structures would have to increase the total cost to achieve early completion: because doing so would cause it to incur additional expenses. C B Structures further explained the Premium's relationship to the expenses it would incur as follows: "This premium will allow us to: authorize all the necessary overtime; bring on temporary staff as needed; cover *overtime premiums* charged by subs and suppliers; cover costs for temporary heat and/or special materials/mixes." *Id.* (emphasis added). C B Structures' use of the phrase "overtime premiums" to describe payments it would have to make to its subcontractors in order to meet an earlier completion date further clarifies that the word "premium" was used to mean an incurred expense. Read in context, the repeated use of the word "premium" in the Proposal Letter in connection with a description of additional expenses that C B Structures would have to absorb in order to complete the Project three months earlier than originally planned makes it clear to the reader that the "Premium" was an increase in the proposed price of the Contract occasioned by the need to incur additional expenses to finish early, and not a bonus or incentive payment, entitlement to which would be contingent upon actually finishing the Project by December 31, 2012.

Moreover, this is exactly how Pepco's engineering consultant (to whom the Proposal Letter was sent) understood C B Structures' proposed price increase to mean, as he forwarded it to Pepco with an email that said, relevantly: "In regards to [C B Structures'] scheduling for

Forestville, they can complete the project by 12/31/12, at an accelerated schedule for an additional $68,220.00, making their total $594,445 + $68,220 = $666,665." Ex. 2, Jt. Rec. 3. This email shows that he understood the extra sum to be an increase in the base cost of the Contract occasioned by the earlier completion date and *not* a bonus or incentive payment that would be unearned unless that completion date was met.  More significantly, it shows that *Pepco* was informed prior to entering into the Contract that, as proposed by C B Structures, the Premium did not function as an incentive.  And, it establishes that, when Pepco failed to include language in the Contract clearly stating its requirement that the Premium be an incentive, it "'had the better opportunity to understand and explain [its] meaning'" but chose not to do so.  *See Anderson Adventures, LLC v. Sam & Murphy, Inc*., 932 A.2d 1186, 1194 (Md. Ct. Spec. App. 2007) (citation omitted); *see also John L. Mattingly Const. Co. v. Hartford Underwriters Ins. Co*., 999 A.2d 1066, 1078 (Md. 2010) (stating that court construes contractual language against drafter).

Considering the Contract in the context of this unambiguous language in the Proposal Letter, I find that the Premium was a payment for costs that C B Structures would incur if it accelerated its schedule, to enable it to complete the Project by December 31, 2012.  Jt. Rec. 5. It was not an incentive, only to be paid if C B Structures completed the Project by the end of 2012.  Indeed, the Proposal Letter stated that, even with the Premium, C B Structures could not guarantee completion by the end of 2012.  *See id.*  Thus, the Premium was part of the total amount due under the Contract.

Construing the Contract in this fashion does not mean that Pepco is without a remedy if it proves that C B Structures failed to complete the Project by the agreed-upon earlier date due to its own fault, if the Contract afforded Pepco remedies for C B Structures' breach. However the

Contract used the word Premium, it was paid to enable C B Structures to complete the Project by December 31, 2012, which C B Structures did not do. Thus, C B Structures still may be liable for damages for its failure to meet that deadline, if the evidence supports such a finding.

## VI. CONCLUSION

In sum, I find that the term "Premium" as used in the Contract means an advance mobilization cost that was not contingent on completion of the Project by December 31, 2012 and that was part of the total amount due under the Contract. C B Structures' motion for a declaratory judgment, construed as a motion for summary judgment on the meaning of "Premium," ECF No. 31, IS GRANTED, and Pepco's motion for summary judgment on the same issue, ECF No. 32, IS DENIED.

A separate Order will issue.

Dated: <u>August 13, 2015</u>                             <u>      /S/           </u>
                                                                                Paul W. Grimm
                                                                                United States District Judge

lyb